IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 9, 2001 Session

## SHARON FAYE BROWN HARTMAN v. LEONARD LEE HARTMAN

**Appeal from the Chancery Court for Greene County**
**No. 98000350     Thomas R. Frierson, II, Chancellor**

**FILED JULY 20, 2001**

**No. E2000-1927-COA-R3-CV**

In this divorce action, Leonard Lee Hartman ("Defendant"), appeals the Trial Court's award of alimony *in futuro* to Sharon Faye Brown Hartman ("Plaintiff"), in the amount of $800 per month for twenty years or remarriage, whichever occurs first. Defendant does not dispute the Trial Court's determination that Plaintiff can not be economically rehabilitated. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed.**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, J. and CHARLES D. SUSANO, JR., J., joined.

Jerry W. Laughlin, Greeneville, Tennessee, for the Appellant, Leonard Lee Hartman.

Mark D. Slagle, Johnson City, Tennessee, for the Appellee, Sharon Faye Brown Hartman.

### OPINION

### Background

The parties were married for thirty years. Plaintiff was age 15 and Defendant was 23 years old when they married. Plaintiff, age 45 at the time of trial, did not finish high school but later obtained a GED. Defendant, age 54 at the time of trial, is a chiropractor and was just starting his practice when they married. The parties have three children, all over the age of 18.

The parties owned several pieces of real property including their marital residence and an adjacent farm totaling approximately 200 acres; Defendant's chiropractic office building; an apartment building housing five apartments; a parcel of property consisting of 25 acres and 2 houses ("Brick House Property"); and an apparently unimproved lot on Fairgrounds Road.

Plaintiff has been employed as a teaching assistant by the Greeneville City School System for the past six years and earns approximately $730 per month in gross income and $590 in net income monthly.[1] Plaintiff's teaching assistant position was the first job that she held outside of working in the parties' home, on their farm, and occasionally assisting in Defendant's chiropractic clinic. The only list of monthly expenses that Plaintiff submitted was filed in support of her pre-trial Motion for Possession of Marital Residence and Temporary Spousal Support. Plaintiff's list of monthly expenses totaled $2,760.[2] Moreover, the record establishes that Plaintiff had no involvement with the parties' finances as Defendant had complete control over their spending. Plaintiff was not allowed to write any checks from the parties' joint account. Defendant testified that if Plaintiff had to purchase groceries, she had to ask for a check from Defendant.

As for Defendant's earnings, the proof in the record establishes that Defendant's chiropractic practice between 1994-98 earned an annual, average gross of approximately $137,100 with an annual, average net profit of $67,870. Defendant testified that he anticipated earning less in 1999, around $59,000, due to changes in referrals to his practice precipitated by HMO's. The record contains limited proof regarding Defendant's expenses.

In addition to the chiropractic clinic, Defendant testified that the parties also enjoyed income of $1,380 per month or $16,560 per year from rental property composed of five apartments. Defendant did not specify whether this was net or gross income. The parties' 1998 tax return, however, shows an actual yearly net rental income of $12,940, or $1,078 per month. The parties also have a cattle and tobacco farming operation which, according to the parties' 1994-98 tax returns, sustained yearly losses of between $28,000 and $74,000. The claimed farming losses, of course, substantially reduced the parties' adjusted gross income.

---

[1] Plaintiff's list of expenses submitted in support of her Motion for Possession of Marital Residence and Temporary Spousal Support shows that she has a monthly net income of $550. Plaintiff, however, entered into evidence a pay stub which shows that her monthly net income is $594.

It should be noted that we refer to the parties' incomes and expenses in round numbers.

[2] Part of Plaintiff's stated monthly expenses included $1,450 in expenses for the parties' marital home. As will be discussed, Plaintiff was not awarded the parties' marital home by the Trial Court but was awarded the Brick House Property that included two houses, one of which Plaintiff intended to make her new residence ("Brick House"). Although there is proof in the record regarding what types of repairs will be needed for the Brick House, no proof was submitted regarding the actual, average monthly expenses associated with the Brick House. Nevertheless, the parties' expenses during their marriage are an "excellent indicator of the amount of support which will be needed after the divorce." *Smith v. Smith*, 912 S.W.2d 155, 159 (Tenn. Ct. App. 1995).

At trial, the issues for determination by the Trial Court were the 1) grounds for divorce; 2) division of marital property; and 3) spousal support. The parties submitted a list of values for their marital property and essentially agreed upon the values with the exception of Defendant's chiropractic practice. Plaintiff valued Defendant's practice at $200,000, while Defendant testified that he was not able to provide a value.

Defendant submitted proof at trial that Plaintiff could earn more money if employed by Greene Valley Developmental Center, a facility for mentally disabled children and adults. Defendant called as a witness a patient of his who is a supervisor at Greene Valley ("Greene Valley Supervisor"). The Greene Valley Supervisor testified that at Defendant's request, he contacted Plaintiff regarding potential employment and an interview. The Greene Valley Supervisor testified that Plaintiff could earn approximately $1,310 per month but that Plaintiff was not interested. On cross-examination, the Greene Valley Supervisor admitted, however, that he did not have any actual hiring authority.

The Trial Court awarded Plaintiff a divorce on grounds of inappropriate marital conduct. Defendant committed adultery in 1998. Defendant's adultery precipitated Plaintiff's filing for divorce. The parties attempted reconciliation but failed because, according to Plaintiff, Defendant would not stop seeing his paramour. Defendant denied this was the reason the reconciliation attempt failed. Regarding the issue of spousal support, the Trial Court, in light of the disparities in the parties' earning power, awarded alimony *in futuro* to Plaintiff in the amount of $800 per month for twenty years or until Plaintiff's remarriage, whichever occurs first.

In its Memorandum Opinion incorporated into the Trial Court's Final Decree of Divorce by reference thereto, Defendant was awarded the marital residence and the adjacent farm and farm equipment; the 1999 livestock and tobacco sales proceeds; two pick-up trucks; and his chiropractic practice, office building, equipment and fixtures. According to the Trial Court's Memorandum Opinion, the total value of property awarded to Defendant was $698,960, plus Defendant's life insurance and the undetermined value of his chiropractic practice.[3] The Trial Court also ordered Defendant to pay all of the parties' marital debts of $239,000. As one of the parties' marital debts, Defendant claimed a debt owed to his mother in the amount of $127,000. Plaintiff disputed that this was a marital debt.

The Trial Court awarded Plaintiff the Brick House Property, which included two houses; the apartment building; the Fairgrounds Road parcel; the parties' 1989 automobile; and furniture. The total value of Plaintiff's property award, according to the Trial Court's Memorandum Opinion, was $339,900. Additionally, the Trial Court, in order to reach an equitable division of marital property, awarded Plaintiff $123,530 which Defendant had the option of paying over fifteen

---

[3] The record does not contain any clear proof regarding the cash surrender value of Defendant's life insurance policy as Defendant testified at trial that he was not sure what the value was. As for the value of Defendant's chiropractic practice, the Trial Court held, in its Memorandum Opinion, that the proof presented at trial regarding the practice's fair market value was insufficient.

years at interest equal to the prime lending rate ("Cash Award").  Plaintiff also received stock and her Roth IRA worth approximately $2,000.

After the Trial Court's Final Decree of Divorce was entered, Defendant filed a Motion to Alter or Modify the Final Decree of Divorce or in the Alternative, to Grant a New Trial. Defendant asserted a number of grounds in support of his motion, arguing that the award of alimony *in futuro* was not warranted and even if the award was appropriate, it should be reduced.  In support of his motion, Defendant argued that the property awarded to Plaintiff, valued at a total of $463,430, including the Cash Award of $123,530, essentially constituted an award of alimony *in solido*. Defendant also pointed to the income-producing apartment building and Cash Award that were awarded to Plaintiff along with Plaintiff's ability to obtain higher-paying employment as evidenced by the testimony of the Greene Valley Supervisor.  The Trial Court denied Defendant's motion for a new trial but partially granted Defendant's motion to alter or amend to the extent that it placed the lien to secure the $123,530 debt upon Defendant's chiropractic office building instead of the parties' marital home.  Defendant appeals.  We affirm.

### Discussion

On appeal and although not exactly stated as such, Defendant contends that the Trial Court erred in awarding Plaintiff alimony *in futuro* because after the Trial Court's division of assets and liabilities, Plaintiff has no economic need for alimony and Defendant has no ability to pay alimony.  No other issues are before us.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the Trial Court, unless the preponderance of the evidence is otherwise. Tenn. Rule App. P. 13(d); *Brooks v. Brooks*, 992 S.W.2d 403, 404 (Tenn. 1999).  The Trial Court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Ganzevoort v. Russell,* 949 S.W.2d 293, 296 (Tenn. 1997).

This Court has held that "[t]rial courts have broad discretion to determine whether spousal support is needed and, if so, its nature, amount, and duration." *Anderton v. Anderton*, 988 S.W.2d 675, 682 (Tenn. Ct. App. 1998).  "The amount of alimony awarded is largely a matter left to the discretion of the trial court, and the appellate courts will not interfere except in the case of an abuse of discretion." *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001).  Although "the legislature has demonstrated a preference for an award of rehabilitative alimony[. . . ,]" Tenn. Code Ann. § 36-5-101(d)(1), the relevant statute for alimony, does contemplate a long-term award of alimony, providing:

> Where there is such relative economic disadvantage and rehabilitation
> is not feasible in consideration of all relevant
> factors . . . then the court may grant an order for payment of support
> and maintenance on a long-term basis . . . .

*Crabtree v. Crabtree*, 16 S.W.3d 356, 358 (Tenn. 2000); Tenn. Code Ann. § 36-5-101(d)(1). "The purpose of [alimony *in futuro*] is to provide financial support to a spouse who cannot be rehabilitated." *Burlew v. Burlew*, 40 S.W.3d at 471.

When determining whether a spouse should receive support and what type of alimony is warranted, trial courts are to apply the factors outlined in Tenn. Code Ann. § 36-5-101(d)(1), which provides:

> In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:
>
> (A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
>
> (B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;
>
> (C) The duration of the marriage;
>
> (D) The age and mental condition of each party;
>
> (E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
>
> (F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;
>
> (G) The separate assets of each party, both real and personal, tangible and intangible;
>
> (H) The provisions made with regard to the marital property as defined in § 36-4-121;
>
> (I) The standard of living the parties established during the marriage;

(J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-101(d)(1). While need and the ability to pay are the critical factors when setting the amount of an alimony award, all relevant factors must be considered. *Burlew v. Burlew*, 40 S.W.3d at 470.

The Trial Court specifically found that rehabilitative alimony was not feasible and long-term support was necessary. The Trial Court awarded $800 per month in alimony *in futuro* to Plaintiff for a period of twenty years or remarriage, whichever occurs first. On appeal, Defendant contends that the Trial Court erred in awarding alimony *in futuro* to Plaintiff because after the Trial Court's division of assets and liabilities, Plaintiff is not economically disadvantaged and Defendant does not have the ability to pay alimony. Defendant argues that after Plaintiff receives her net salary from Greeneville City School System, the rental income, and the principal and interest that Defendant owes Plaintiff under the Trial Court's Cash Award, Plaintiff's yearly income will be approximately $39,000.[4] Defendant, however, does not contend on appeal that the Trial Court erred in finding that Plaintiff could not be economically rehabilitated.

By comparison, Defendant contends that his net disposable income will be less than that of Plaintiff. Defendant argues that even without considering the alimony payments, he will be paying approximately $36,660 yearly toward the liabilities that the Trial Court assessed against him, including the mortgage, the debt owed to his mother, and the Cash Award to Plaintiff.[5] In light of

---

[4] In his brief, Defendant set forth the following list of sources of net income for Plaintiff:

| | | |
|---|---|---|
| Greeneville City School System (594.37 x 12) | | $ 7,132.44 |
| Rental income | ($1,380 x 12) | 16,560.00 |
| Interest payments from Defendant for Cash Award | | 11,115.00 |
| Principal payments from Defendant for Cash Award (using prime rate and proposed amortization schedule) | | 4,206.27 |
| | | $39,013.71 |

[5] In his brief, Defendant set forth the following list of yearly debts:

(continued...)

these debts and Defendant's anticipated reduction in his chiropractic practice's profits to $59,000, Defendant argues his disposable income will be reduced to $22,340.

Defendant also argues on appeal that the Trial Court erroneously held, in its Memorandum Opinion, that Defendant had annual business and rental income in excess of $100,000. Defendant argues that the Trial Court erroneously considered as his income the rental income of approximately $1,380 per month, or $16,560 per year, as part of Defendant's income even though the Trial Court awarded Plaintiff this rental property.

We agree with Defendant that "the need of the disadvantaged spouse" and "the ability of the obligor spouse to provide support" are the most important factors of the alimony statute. *Burlew v. Burlew*, 40 S.W.3d at 470. They are not, however, the only factors.

With respect to the issue of Plaintiff's need as based upon the proof in the record, we hold that the Trial Court did not err in finding that Plaintiff has a need for alimony. Discussing the intent behind alimony, our Supreme Court has held:

> "[t]he purpose of spousal support is to aid the disadvantaged spouse to become and remain self-sufficient and, when economic rehabilitation is not feasible, to mitigate the harsh economic realities of divorce."

*Burlew v. Burlew*, 40 S.W.3d at 470-71 (quoting *Anderton v. Anderton*, 988 S.W.2d at 682). This Court has acknowledged that "[i]f one spouse is economically disadvantaged compared to the other, the courts are generally inclined to provide some type of support." *Batson v. Batson*, 769 S.W.2d 849, 860 (Tenn. Ct. App. 1988).

Plaintiff holds a GED and nets $590 per month from working as a teaching assistant. Considering Plaintiff's work experience, her age, and education level, it does not appear her earning capacity will improve. The Trial Court apparently discounted the testimony of the Greene Valley Supervisor regarding Plaintiff's potential earning capacity at his facility, and the Trial Court's determinations regarding witness credibility are given "considerable deference . . . ." *Davis v. Liberty Mutual Ins. Co.*, 38 S.W.3d 560, 563 (Tenn. 2001). Moreover, the proof in the record clearly establishes that Defendant kept dictatorial control of the parties' finances, and as a result, Plaintiff had little, if any, opportunity to obtain any financial management skills.

---

[5](...continued)

| | |
|---|---|
| Interest only on the farm mortgage ($96,000 x .09) | $ 8,640.00 |
| Interest only to Defendant's mother for loan ($127,000 x. 10) | 12,700.00 |
| Principal and interest payments to Plaintiff for Cash Award (using prime rate and proposed amortization schedule) | 15,321.27 |
| | $36,661.27 |

In addition to her regular salary, pursuant to the Trial Court's award, Plaintiff will also receive monthly net rental income which is, according to the parties' 1998 tax return, $1,078. The only other proof in the record regarding the amount of rental income is Defendant's testimony that the rental property's five apartments would bring $1,380 per month without specifying whether that amount represents net or gross income. The Trial Court made no specific factual determination regarding the amount of rental income, and in our *de novo* review of this fact, we determine that the parties' 1998 tax return is the better indicator of the amount of net rental income that Plaintiff can expect to receive from the rental property. *Archer v. Archer*, 907 S.W.2d 412, 416 (Tenn. Ct. App. 1995); *Sandusky v. Sandusky*, No. 01A01-9808-CH-00416, 1999 WL 734531, at * 2 (Tenn. Ct. App. Sept. 12, 1999).

Plaintiff also will receive approximately $1,280 per month in interest and principal payments for fifteen years from Defendant to satisfy the Cash Award. We disagree with Defendant's argument that this entire payment should be imputed as income to Plaintiff. The Trial Court made the Cash Award to Plaintiff, a total of $123,530, in an effort to make the property division equitable and gave Defendant the option of paying the award over a period of fifteen years. *See* Tenn. Code Ann. § 36-4-121. If the Trial Court awarded this as a lump sum payment, it would not be imputed as monthly income to Plaintiff. Plaintiff should not be penalized because Defendant has chosen to pay over time. The interest payments, however, should be imputed to Plaintiff as income, as is the rental income from the rental property. *See Carlton v. Carlton*, No. 02A01-9207-CH-00196, 1993 WL 382002, at * 7 (Tenn. Ct. App. Sept. 24, 1983) (finding that the recipient of alimony will also have income from the interest on the cash award received in the property division). Using Defendant's proposed amortization schedule, Plaintiff will receive an average of $7,088 per year in interest, or $590 per month, over the fifteen-year period.

Accordingly, from the three above-outlined sources, Plaintiff will have a yearly net income of $27,124 which is calculated as follows:

| | |
|---|---|
| Salary from Greeneville School System | $ 7,100 |
| Average Interest from Cash Award | 7,088 |
| Rental Income ($1,078 month as shown by the parties' 1998 tax return) | 12,936 |
| TOTAL | $27,124 |

As discussed, Plaintiff's monthly expenses total $2,760, or $33,120 per year. Plaintiff's disposable income does not meet her expenses. Therefore, the proof contained in the record supports the Trial Court's finding that Plaintiff has a need for alimony.

We next address the question of does Defendant has the ability to pay the alimony awarded to Plaintiff. We agree with Defendant's contention that the evidence does preponderate against the Trial Court's determination that Defendant has income of $100,000. *See* Tenn. R. App. P. 13(d); *Brooks v. Brooks*, 992 S.W.2d at 404. The Trial Court apparently considered both Defendant's gross profits from his chiropractic practice and the rental income when it made this

determination. It is inappropriate to consider the rental income since the Trial Court awarded the rental property to Plaintiff. Taking only Defendant's net profits from his practice into consideration, we find that between 1994 and 1998, Defendant's tax returns show that he had an average net profit of approximately $67,870. Although Defendant testified at trial that for 1999, he anticipated earning only $59,000, this court has held that past tax returns are a good indicator of whether an obligor spouse has the ability to pay alimony. *See Lloyd v. Lloyd*, 860 S.W.2d 409, 413 (Tenn. Ct. App. 1993).

Defendant contends that the alimony award is punitive since he will have less disposable income than Plaintiff after meeting his debt obligations in the amount of $36,660 per year. We agree with Defendant that alimony awards are not to be punitive and acknowledge that Defendant may have difficulty maintaining the standard of living that he enjoyed before the parties' divorce. In light of Plaintiff's economic disadvantage when compared with Defendant's earning capacity and financial experience, however, we do not find this alimony award to be punitive. In addition, although need and the ability to pay are the most important factors, they are not the only factors for the court's consideration when determining whether alimony is warranted. "Spousal support decisions hinge on the unique facts of the case and require a careful balancing of the factors in Tenn. Code Ann. § 36-5-101(d)(1) . . . ." *Anderton v. Anderton*, 988 S.W.2d 675, 683 (Tenn. Ct. App. 1998).

Defendant's fault in causing the end of the marriage is relevant. *See* Tenn. Code Ann. § 36-5-101(d)(1)(K). Defendant did not dispute that he had an extramarital affair in 1998. Plaintiff testified that the parties' attempted reconciliation failed because Defendant would not stop seeing his paramour. "The amount of alimony should be determined so 'that the party obtaining the divorce [is not] left in a worse financial situation than he or she had before the opposite party's misconduct brought about the divorce.'" *Burlew v. Burlew*, 40 S.W.2d at 471 (quoting *Aaron v. Aaron*, 909 S.W.2d 408, 411 (Tenn. 1995) (alterations in original).

In addition, the facts of this case warrant the alimony award under several other factors of Tenn. Code Ann. § 36-5-101(d)(1). The parties had a thirty-year marriage and were married for Plaintiff's entire adult life beginning when Plaintiff was merely 15 years old. Tenn. Code Ann. § 36-5-101(d)(1)(C). After getting married, Plaintiff did not finish school and had completed only the eighth grade. Tenn. Code Ann. § 36-5-101(d)(1)(B). During their marriage, Plaintiff contributed to the parties' household and farm and until 1994, worked as a stay-at home mother of three children. Tenn. Code Ann. § 36-5-101(d)(1)(B) & (J). Plaintiff testified that over the years, she performed household tasks and farm chores and assisted Defendant with his chiropractic practice.[6] *Id.* At the time of trial, Plaintiff had only held one job outside of the home. This job is her current position as a teaching assistant that Plaintiff obtained when she was

---

[6] Defendant apparently believed that he could discount Plaintiff's contributions to the household by testifying at trial that he sometimes had to wash his own dishes after working in the office all day. Defendant did not, however, provide any proof that he suffered from any physical disability that would render him incapable of performing such a task.

-9-

approximately 40 years old. *Id.* Moreover, as discussed, Defendant kept a tyrannical reign over the parties' finances. Tenn. Code Ann. § 36-5-101(d)(1)(A)-(B) & (L).

The Trial Court had broad discretion to determine whether spousal support was needed, and if so its nature, amount and duration. The Trial Court did just that. Our job as an appellate court is not to fine tune the Trial Court's award of alimony but rather is to correct errors by the Trial Court in the execution of its discretion. Accordingly, after reviewing the record and carefully balancing the factors listed in Tenn. Code Ann. § 36-5-101(d)(1), we hold that the Trial Court did not err in awarding alimony *in futuro* to Plaintiff in the amount of $800 for a period of twenty years or remarriage, whichever occurs first. *See Anderton v. Anderton*, 988 S.W.2d at 683. As this is an award of alimony *in futuro*, we note that it is subject to modification, if appropriate, in the future by the Trial Court. *Burlew v. Burlew*, 40 S.W.3d at 471.

## CONCLUSION

The judgment of the Trial Court is affirmed and this cause is remanded to the Trial Court for such further proceedings as may be required, if any, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed against the Appellant, Leonard Lee Hartman, and his surety.

_____
D. MICHAEL SWINEY, JUDGE